T.C. Summary Opinion 2010-37

UNITED STATES TAX COURT

PAUL AND MELODY FUCALORO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1082-09S.                    Filed March 30, 2010.

Paul and Melody Fucaloro, pro sese.

<u>Diana P. Hinton</u>, for respondent.

CHIECHI, <u>Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

_____

[1]Hereinafter, all section references are to the Internal Revenue Code (Code) in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency of $18,020 in petitioners' Federal income tax for their taxable year 2005. The issue remaining for decision is whether petitioners are entitled for their taxable year 2005 to a claimed business loss of $57,741.[2] We hold that they are not.

## Background[3]

Some of the facts have been stipulated and are so found.

Petitioners resided in New York at the time they filed the petition in this case.

During 2005, petitioner Paul Fucaloro (Mr. Fucaloro) was not licensed as a sport agent. During that year, he executed each of two separate agreements entitled "MANAGEMENT AGREEMENT". One of those agreements pertained to Kertson Manswell (Mr. Manswell), who was identified in that agreement as "Boxer", and the other pertained to Bermane Stiverne (Mr. Stiverne), who was identified in that agreement as "Boxer". The agreement involving Mr. Manswell was effective as of March 5, 2005, and the agreement

---

[2]Respondent made other determinations in the notice of deficiency that respondent issued to petitioners for their taxable year 2005 (2005 notice). Resolution of those other determinations flows from our resolution of the issue presented here.

[3]As directed by the Court, petitioners and respondent filed respective opening briefs. Petitioners' opening brief contains certain statements that are not supported by reliable evidence in the record in this case and has certain attachments that are not part of that record. We shall disregard those statements and attachments. See Rule 143(c).

involving Mr. Stiverne was effective as of May 20, 2005.  Except for the identity of the so-called boxer, the effective date, and the rate of compensation for the services to be performed, each of the two agreements that Mr. Fucaloro executed during 2005 contained essentially the same provisions as follows:

> This Management Agreement (the "Agreement") is entered effective as of March 5, 2005 [in the case of Mr. Manswell and May 20, 2005, in the case of Mr. Stiverne] by and among Cameron Mitchell Dunkin, D & D Boxing, Inc. ("Duncan") * * * Las Vegas, Nevada * * * or nominee, and Paul Ficaro[4] (hereinafter referred to as "Manager") and Kertson Manswell [in the case of the management agreement effective as of March 5, 2005, and Bermane Stiverne in the case of the management agree-ment effective as of May 20, 2005] (hereinafter re-ferred to as "Boxer").

> ### RECITALS

> A.    Boxer desires to become duly qualified and licensed as a professional boxer with, among others, the Nevada State Athletic Commission (the "Boxing Com-mission").  The Boxer hereby engages the Manager, and the Manager agree for a period of Five (5) years from the date of Boxers next professional bout (the "Initial Term").

> B.    Manager is duly qualified to manage, advise and consult with professional boxers in furthering their professional boxing career.

---

[4]Although the agreement pertaining to Mr. Manswell stated that the agreement is among Cameron Mitchell Dunkin, D & D Boxing, Inc., "Paul Ficaro", and Mr. Manswell, the signature that appeared over the typewritten name "Paul Ficaro" was Paul Fucaloro.  The record does not explain the use of the name "Paul Ficaro" in the agreement pertaining to Mr. Manswell.

C.     Boxer desires to retain Manager to perform certain duties in connection with managing, advising and consulting Boxer in his professional boxing career and Manager desires to undertake such representation on behalf of Boxer.

NOW, THEREFORE, the parties agree as follows:

1.     <u>MANAGEMENT RELATIONSHIP</u>

(a)  During the Term of this Agreement, Boxer hereby engages Manager as Boxer's exclusive manager and advisor to render the services set forth in this Agreement and Manager agrees to act in such capacity on behalf of Boxer. Accordingly, Boxer agrees that, Boxer will not engage any other representative or agent to render similar services on behalf of Boxer and all matters pertaining to Boxer's professional boxing career will not be effectuated without Manager's prior consent. Boxer and Manager shall execute and file state management agreements with the Boxing Commission of the applicable jurisdictions, including the Nevada State Athletic Commission. Manager will consult, negotiate terms and contract(s) with boxing promoters in connection with boxing contests and/or exhibitions. Manager will represent Boxer and act as his negotiator to fix and agree upon the terms governing all manner of disposition, use, employment and exploitation of Boxer's services, talents and the products thereof. Boxer agrees that Manager will represent in connection with Boxer's participation in professional boxing contests and exhibitions, the Boxer's exploitation and professional use of his talents, personality, name and likeness in every manner whatsoever throughout the world.

(b)  Boxer recognizes that Manager may perform similar duties for other professional boxers (including boxers in the same weight division as Boxer) and otherwise engage and pursue other business endeavors.

(c)  Boxer is not under any disability, restriction or prohibition, either contractual or otherwise, with respect to Boxer's right to execute this Agreement and to fully perform consistent with its terms and conditions.

(d)  Boxer has the right, power and authority to do business hereunder, and Manager's activities on Boxer's behalf under this Agreement will not infringe upon, violate or interfere with the rights, whether statutory, contractual or otherwise, of any third party.

(e)  Boxer shall diligently devote himself to his professional boxing career and do all things necessary and appropriate to promote his career and generate earnings therefrom.  Boxer agrees to participate in all training necessary to compete as a world class professional boxer.

2.  <u>DUTIES OF MANAGER</u>

Manager, in conjunction with Boxer's promoter, shall provide such advice, guidance, direction and services to further the professional boxing career of Boxer including, but not limited to, the following:

(a)  Manager shall coordinate with Boxer's promoter in selecting opponents for all professional boxing matches in which Boxer is a participant; provided, however, that Manager shall consult with Boxer prior to the final selection of an opponent.

(b)  Manager shall negotiate the terms and conditions of all professional boxing matches most favorable to Boxer, including all matters involving global television broadcasts, sponsorship and endorsement matters and ancillary issues inherent in the financial aspects of Boxer's professional boxing career.

(c)  Manager shall coordinate with Boxer's promoter the dates, times and sites of all publicity, promotional and public relations activities as well as the dates, times and sites of all professional boxing matches to be engaged by Boxer.

(d)  Manager shall coordinate the training activities of Boxer.  Boxer shall select the Trainer, with input from Manager.

(e)  Manager shall, to the best of his ability, perform services for and on behalf of Boxer as contemplated under this Agreement and shall perform such other duties and responsibilities as he deems appropriate in connection with the Boxer's professional boxing career.

(f)  Manager agrees that he will promptly and faithfully comply with the applicable rules of the Boxing Commission, the Muhammad Ali Boxing Reform Act and any other required governing authority with regard to the management services contemplated to be rendered hereunder.

3.    TERM

(a)  The initial term of this Agreement shall commence on March 5, 2005 [in the case of Mr. Manswell and May 20, 2005, in the case of Mr. Stiverne] and continue for a period of five (5) years from the date of Boxers next professional bout (the "Initial Term").  Notwithstanding the foregoing, Manager shall have the option to extend the Initial Term of this Agreement for an additional two (2) years (i.e., through March 4, 2012 [in the case of Mr. Manswell and May 19, 2012 in the case of Mr. Stiverne]) or for the maximum term permitted by applicable law in the event that, during the Initial Term, Boxer is ranked in the top twenty (20) of the World Boxing Association, World Boxing Council, International Boxing Federation, International Boxing Association or World Boxing Organization at the time of the expiration of

the Initial Term.  The Initial Term and the
two (2) year extension of the Initial Term,
if applicable, are referred to collectively
as the "Term".

(b)  In the event, the Boxer or Oppo-
nent suffers an injury which results in his
inability to participate in boxing contests
and/or exhibitions, the Initial Term and/or
the renewal Term of this Agreement (as appro-
priate) shall automatically be extended by
Boxers or Opponents disability.

4.    FINANCIAL CONSIDERATIONS

Boxer hereby agrees and obligates
himself to pay to the Manager Cameron Dunkin,
D & D Boxing, Inc. or nominee (11% [in the
case of Mr. Manswell, and 23 1/3% in the case
of Mr. Stiverne]) and Paul Ficaro (22 1/3%
[in the case of Mr. Manswell and 10% in the
case of Mr. Stiverne]) and Manager agrees to
accept as full compensation for the services
he shall render pursuant to section 2, a
total of Thirty-three and one-third percent
(33 1/3 %), of all boxing compensation.
Boxer will instruct promoter to pay to the
Manager his share of the purse at the time he
pays Boxer.  Boxer shall execute all docu-
ments required by the Boxing Commission to
remit such fees directly to Manager.  For
purposes of this Agreement, Boxing Compensa-
tion means the cumulative amount of purse
income to be received by Boxer in connection
with professional boxing matches/exhibitions
which includes, where applicable, purse
amounts, purse advances, share of live gate
revenues, television revenues, license fees,
cable revenues, pay-per-view revenues, spon-
sorship, and all other revenues directly
related and received in connection with the
professional boxing career of Boxer.

5.    BREACH BY BOXER

(a)  Boxer hereby acknowledges and
agrees that the services as set forth in this
agreement as rendered by him are of special,

unusual and extraordinary character, giving them particular value, the loss of which could not reasonably and adequately be measured in or compensated by damages in an action at law. Boxer therefore agrees that the Manager shall be entitled to injunctive and other equitable relief to prevent any material breach of default by Boxer hereunder, which shall be in addition to and without prejudice to any and all other rights and remedies which the Manager may have. Manager's right to represent Boxer as Boxer's sole and exclusive boxing manager and advisor (with the exception of Boxer's attorney) and Boxer's obligation to use Manager exclusively in such capacity are unique and extraordinary rights and that any breach or threatened breach by Boxer under this Agreement shall be material and shall cause Manager immediate and potentially irreparable damages which cannot be adequately compensated for solely by money judgement. Accordingly, Boxer agrees that, in addition to all other forms of relief and all other remedies which may be available to Manager in the event of any such breach or threatened breach by Boxer, Manager shall be entitled to seek and obtain injunctive relief against Boxer.

(b) During the Term of this agreement and any extension thereof, Boxer agrees to render services solely and exclusively for the Manager and agrees that he will not take part in any professional boxing contests and/or exhibitions without Managers written approval.

(c) Boxer shall and agrees to indemnify and hold the Manager harmless against and from any and all claims, damages, liabilities, costs and expenses, including without limitation reasonable attorney's fees, arising out of the exercise by the Manager of any rights granted herein, out of any breach by Boxer or any representation, warranty or other provision herein, or out of any wrongful act or omission by Boxer/Athlete.

\*       \*       \*       \*       \*       \*       \*

13.    ALTERATION AND AMENDMENT:INTEGRATION

(a)  This Agreement sets forth the entire understanding between the parties relating to the relationship of Manager and Boxer.  No change or modification to this Agreement shall be valid unless the same is in writing and signed by the parties to this Agreement.  No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person against whom it is sought to be enforced.

(b)  If any of the terms or provisions of this Agreement are in conflict with any applicable statute, rule or law, then such term or provision shall be deemed inoperative to the extent that they may conflict with such statute, rule or law and shall be deemed to be modified to conform with such statute, rule or law.

(c)  The parties agree to take all actions necessary to file the necessary management agreements with the applicable state Boxing Commission.

At no time did Mr. Fucaloro have a separate bank account with respect to any of his activities relating to boxing (boxing-related activities).  Nor did he at any time maintain a contemporary diary or any books with respect to those activities.

As of the time of the trial in this case, Mr. Fucaloro had been involved in certain boxing-related activities for at least 20 years and had never made a profit from those activities.

During 2005, Mr. Fucaloro made 13 trips (2005 trips) all but one of which occurred over a weekend.  The 2005 trips consisted of (1) six trips to Las Vegas, Nevada, (2) two trips to

Charleston, South Carolina, (3) one trip to Tampa, Florida, (4) one trip to Montreal, Canada, (5) one trip to Pittsburgh, Pennsylvania, (6) one trip to Los Angeles, California, and (7) one trip to Aruba. During the 2005 trips, Mr. Fucaloro incurred expenses for (1) transportation, including air transportation and ground transportation, (2) hotels, and (3) meals and beverages (collectively, meals).

During 2005, Mr. Fucaloro wired through Western Union a total of $5,350 to Mr. Stiverne. In order to wire that total amount to Mr. Stiverne, during 2005 Mr. Fucaloro was required to pay total service charges to Western Union of $476.

During 2005, Mr. Fucaloro wired through Western Union a total of $5,200 to Mr. Manswell. In order to wire that total amount to Mr. Manswell, during 2005 Mr. Fucaloro was required to pay total service charges to Western Union of $344.99.

During 2005, Mr. Fucaloro wired through Western Union (1) a total of $7,500 to Mark Suarez (Mr. Suarez) and (2) $1,500 to Cameron Dunkin (Mr. Dunkin). In order to wire those respective amounts to Mr. Suarez and Mr. Dunkin, during 2005 Mr. Fucaloro was required to pay total service charges to Western Union of $617.

Petitioners filed Form 1040, U.S. Individual Income Tax Return, for their taxable year 2005 (2005 return). In that return, petitioners reported total wages of $175,643, taxable

interest of $97, taxable refunds, credits, or offsets of State and local income taxes of $1,615, and pensions and annuities of $73,297 and claimed a business loss from Schedule C, Profit or Loss From Business (2005 Schedule C), of $57,741. As a result, petitioners claimed total income of $192,911 in their 2005 return.

In the 2005 Schedule C, petitioners showed Mr. Fucaloro as the name of the proprietor and "LICENSED SPORT AGENT" as the "Principal business or profession". In the 2005 Schedule C, petitioners reported no gross receipts or sales and no gross income. In the 2005 Schedule C, petitioners claimed $15,803 of expenses for "Travel", $2,416 of expenses for "Deductible meals and entertainment", and $39,522 of "Other expenses"[5] and claimed a loss of $57,741.[6]

Respondent issued to petitioners the 2005 notice. In that notice, respondent disallowed the expenses and the loss of $57,741 that petitioners claimed in the 2005 Schedule C.

---

[5]In the 2005 Schedule C, petitioners' only description of the "Other expenses" of $39,522 was "RECRUITMENT".

[6]As discussed above, petitioners claimed the 2005 Schedule C loss of $57,741 as a business loss that reduced the total income that they reported in their 2005 return.

## Discussion

Petitioners bear the burden of proving that the determinations in the notice are erroneous.[7]  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and petitioners bear the burden of proving entitlement to any deduction claimed.  See <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  The Code and the regulations thereunder require petitioners to maintain records sufficient to establish the amount of any deduction claimed.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Before turning to the issue presented, we shall summarize certain principles applicable to that issue and evaluate certain evidence on which petitioners rely.

A taxpayer is entitled to deduct all the ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business.  Sec. 162(a).

In order for a taxpayer to be carrying on a trade or business within the meaning of section 162(a), the taxpayer must be involved in the activity with continuity and regularity.  <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987).  A sporadic activity will not qualify as carrying on a trade or business for

---

[7]Petitioners do not claim that the burden of proof shifts to respondent under sec. 7491(a).  On the record before us, we conclude that the burden of proof does not shift to respondent under that section.  See <u>id.</u>

purposes of section 162(a).  Id.  The trade or business require-
ment of section 162(a) is not met until the trade or business has
begun to function as a going concern and the activity for which
it is organized is performed.  Jackson v. Commissioner, 86 T.C.
492, 514 (1986), affd. 864 F.2d 1521 (10th Cir. 1989).  In
addition, the taxpayer's primary purpose for carrying on the
activity must be for income or profit.  Commissioner v.
Groetzinger, supra at 35.

For certain kinds of expenses otherwise deductible under
section 162(a), a taxpayer must satisfy certain substantiation
requirements set forth in section 274(d) before such expenses
will be allowed as deductions.  Specifically, in order to deduct
any of the expenses claimed in the 2005 Schedule C for transpor-
tation, for hotels, for meals, and for entertainment, petitioners
must establish that those expenses satisfy the requirements of
not only section 162(a) but also section 274(d).  To the extent
that petitioners carry their burden of showing that those ex-
penses claimed in the 2005 Schedule C satisfy the requirements of
section 162(a) but fail to satisfy their burden of showing that
those expenses satisfy the recordkeeping requirements of section
274(d), petitioners will have failed to carry their burden of
establishing that they are entitled to deduct such expenses,
regardless of any inequities involved.  See sec. 274(d); sec.

1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

The recordkeeping requirements of section 274(d) will preclude petitioners from deducting expenditures otherwise allowable under section 162(a)(2) for transportation, for hotels, for meals, and for entertainment unless they substantiate the requisite elements of each such expenditure or use.  See sec. 274(d); sec. 1.274-5T(b)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  The taxpayer is required to

> substantiate each element of an expenditure or use
> * * * by adequate records or by sufficient evidence
> corroborating his own statement.  Section 274(d) con-
> templates that a taxpayer will maintain and produce
> such substantiation as will constitute proof of each
> expenditure or use referred to in section 274.  Written
> evidence has considerably more probative value than
> oral evidence alone.  In addition, the probative value
> of written evidence is greater the closer in time it
> relates to the expenditure or use.  A contemporaneous
> log is not required, but a record of the elements of an
> expenditure or of a business use of listed property
> made at or near the time of the expenditure or use,
> supported by sufficient documentary evidence, has a
> high degree of credibility not present with respect to
> a statement prepared subsequent thereto when generally
> there is a lack of accurate recall.  Thus, the corrobo-
> rative evidence required to support a statement not
> made at or near the time of the expenditure or use must
> have a high degree of probative value to elevate such
> statement and evidence to the level of credibility
> reflected by a record made at or near the time of the
> expenditure or use supported by sufficient documentary
> evidence.  The substantiation requirements of section
> 274(d) are designed to encourage taxpayers to maintain
> the records, together with documentary evidence, as
> provided in paragraph (c)(2) of this section [1.274-5T,
> Temporary Income Tax Regs.].

Sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985).

The elements that a taxpayer must prove with respect to an expenditure for traveling away from home on business, including expenditures for transportation, for hotels, and for meals, are: (1) The amount of each such expenditure for traveling away from home, except that the daily cost of the traveler's own breakfast, lunch, and dinner may be aggregated; (2) the time of each such expenditure, i.e., the dates of departure and return for each trip away from home and the number of days away from home spent on business; (3) the place of each such expenditure, i.e., the destination or locality of travel, described by name of city or town or other similar designation; and (4) the business purpose of each such expenditure, i.e., the business reason for the travel or the nature of the business benefit derived or expected to be derived as a result of travel. Sec. 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014-46015 (Nov. 6, 1985).

The elements that a taxpayer must prove with respect to an expenditure for entertainment are: (1) The amount of each such expenditure for entertainment, except that incidental items such as taxi fares or telephone calls may be aggregated on a daily basis; (2) the time of each such expenditure, i.e., the date of the entertainment; (3) the place of each such expenditure, i.e.,

the name, if any, the address or location, and, if not apparent from the designation of the place, the designation of the type of entertainment, such as dinner or theater; (4) the business purpose of each such expenditure, i.e., the business reason for the entertainment or the nature of business benefit derived or expected to be derived as a result of the entertainment and, except in the case of business meals described in section 274(e)(1), the nature of any business discussion or activity;[8] and (5) the business relationship, i.e., the occupation or other information relating to the person or persons entertained, including name, title, or other designation, sufficient to establish the business relationship to the taxpayer. See sec. 1.274-5T(b)(3), Temporary Income Tax Regs., 50 Fed. Reg. 46015 (Nov. 6, 1985).

---

[8]If a taxpayer claims a deduction for entertainment directly preceding or following a substantial and bona fide business discussion on the ground that such entertainment was associated with the active conduct of the taxpayer's trade or business, the taxpayer is not required to establish the fourth element set forth above that is otherwise required with respect to a deduction for entertainment. Instead, the taxpayer must establish the following: (1) The date and the duration of the business discussion; (2) the place of the business discussion; (3) the nature of the business discussion and the business reason for the entertainment or the nature of the business benefit derived or expected to be derived as the result of the entertainment; and (4) the identification of the persons entertained who participated in the business discussion. See sec. 1.274-5T(b)(4), Temporary Income Tax Regs., 50 Fed. Reg. 46015-46016 (Nov. 6, 1985).

In support of their position that they are entitled to the expenses and the loss of $57,741 that they claimed in the 2005 Schedule C, petitioners rely principally on (1) the testimony of Mr. Fucaloro, (2) certain respective receipts (Mr. Fucaloro's receipts)[9] for air and ground transportation, for hotels, for meals, for entertainment, and for certain miscellaneous expenditures,[10] (3) certain respective schedules of expenses (Mr. Fucaloro's summary schedules) for transportation, for hotels, for meals, for entertainment, and for certain miscellaneous expenditures that Mr. Fucaloro prepared in 2009 at the request of an Appeals officer of respondent, and (4) certain Western Union receipts showing that during 2005 Mr. Fucaloro wired through Western Union to Mr. Stiverne, Mr. Manswell, Mr. Suarez, and Mr. Dunkin $5,350, $5,200, $7,500, and $1,500, respectively.

As for the testimony of Mr. Fucaloro, we found his testimony to be in certain material respects general, vague, conclusory, uncorroborated, and/or self-serving.

As for Mr. Fucaloro's receipts, none of those receipts showed the business purpose for each such expense. Nor did Mr.

[9]Certain of Mr. Fucaloro's receipts contained handwritten notations that Mr. Fucaloro made thereon in 2009 at the request of an Appeals officer of respondent.

[10]Mr. Fucaloro's receipts for miscellaneous expenditures included receipts for certain furniture, certain men's clothing, and payments to various individuals whose alleged involvement in Mr. Fucaloro's boxing-related activities is not established by reliable evidence in the record.

Fucaloro's receipts for claimed entertainment expenses identify the person(s) who was allegedly entertained and who allegedly participated in a business discussion. Moreover, some of Mr. Fucaloro's receipts indicated that the expenses were for certain family members of Mr. Fucaloro or related to his corporation, Farubrik Sports.

As for Mr. Fucaloro's summary schedules, those schedules are for the most part summaries of Mr. Fucaloro's receipts. None of those schedules showed the business purpose for each expense shown. Nor did Mr. Fucaloro's summary schedules identify in the case of claimed entertainment expenses the person(s) who was allegedly entertained and who allegedly participated in a business discussion.

Mr. Fucaloro testified in a general and conclusory manner that he incurred all the claimed expenses for transportation, for hotels, for meals, and for entertainment in order to visit certain unidentified boxers, watch them train, and speak with certain unidentified trainers of those unidentified boxers to ascertain whether those boxers were ready for a boxing match and, if so, the type of match. Mr. Fucaloro did not testify specifically regarding, and did not note on any of Mr. Fucaloro's receipts, the business purpose for each of those expenses. In the case of Mr. Fucaloro's receipts for claimed entertainment expenses, Mr. Fucaloro did not testify regarding the person(s)

who was allegedly entertained and who allegedly participated in a business discussion.  We shall not rely on the testimony of Mr. Fucaloro to establish petitioners' position that they are entitled to deduct the expenses for transportation, for hotels, for meals, for entertainment, and for certain miscellaneous expenditures that they claimed in the 2005 Schedule C.  See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Nor shall we rely on Mr. Fucaloro's receipts and Mr. Fucaloro's summary schedules to establish that position.

As for Mr. Fucaloro's Western Union receipts showing that during 2005 he wired certain amounts of money to Mr. Stiverne, Mr. Manswell, Mr. Suarez, and Mr. Dunkin, Mr. Fucaloro testified that he was required to provide money to Mr. Stiverne, Mr. Manswell, and Mr. Suarez whenever any of them asked for money. That was because, according to Mr. Fucaloro's testimony, if he had not done so, each of those individuals would have hired another manager.  The respective agreements pertaining to Mr. Stiverne and Mr. Manswell under which Mr. Fucaloro and another person were to act as the manager for those individuals make no mention of a requirement that the manager provide money to or for Mr. Stiverne and Mr. Manswell whenever they asked for money.  In addition, the record does not establish that during 2005 there

was any kind of agreement between Mr. Fucaloro and Mr. Suarez.[11]
We shall not rely on Mr. Fucaloro's Western Union receipts to
establish petitioners' position that they are entitled to deduct
the respective amounts of money that Mr. Fucaloro wired during
2005 to Mr. Stiverne, Mr. Manswell, Mr. Suarez, and Mr. Dunkin
and that they claimed in the 2005 Schedule C.

On the record before us, we find that petitioners have
failed to carry their burden of establishing that during 2005 Mr.
Fucaloro engaged in certain boxing-related activities for a
profit.[12]  See generally sec. 1.183-2, Income Tax Regs.  On that
record, we further find that petitioners have failed to carry
their burden of establishing that during 2005 Mr. Fucaloro's
boxing-related activities constituted a trade or business within
the meaning of section 162.  On the record before us, we also
find that petitioners have failed to carry their burden of
establishing that they satisfy all of the recordkeeping require-

---

[11]In fact, the record does not identify who Mr. Suarez is or
his relationship with Mr. Fucaloro during 2005.

[12]Mr. Fucaloro testified that as of the time of the trial in
this case he had been involved in boxing-related activities for
at least 20 years.  Mr. Fucaloro also testified that he expected
to make a profit from his boxing-related activities.  However, as
of the end of 2009 when the trial took place he had not done so
for any year.  It is also significant that at no time did Mr.
Fucaloro maintain any contemporaneous diary or any books with
respect to his boxing-related activities.  Nor did Mr. Fucaloro
maintain at any time a separate bank account for those activi-
ties.  Finally, it is significant that the loss of $57,741 that
petitioners claimed in the 2005 Schedule C reduced the $250,652
of income that they reported in their 2005 return.

ments of section 274(d) and the regulations thereunder with respect to the expenses for transportation, for hotels, for meals, and for entertainment that they claimed in the 2005 Schedule C.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled to the expenses and the loss of $57,741 that they claimed in the 2005 Schedule C.

We have considered all of petitioners' contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.